## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA *ex rel*** | ) |
| **CUAHUTEMOC HERNANDEZ,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **v.** | )    **No. 11 C 6910** |
| | ) |
| **JOSEPH YURKOVICH, Warden,** | )    **Judge Rebecca R. Pallmeyer** |
| **Hill Correctional Center,** | ) |
| | ) |
| **Respondent.** | ) |

## MEMORANDUM OPINION AND ORDER

Cuahutemoc Hernandez ("Petitioner") was convicted of first-degree murder and attempted first-degree murder in state court in 2000. On September 26, 2011, he filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent moved to dismiss the petition as untimely under 28 U.S.C. § 2244(d)(1). Petitioner has filed a motion seeking an evidentiary hearing concerning facts that, he alleges, support equitable tolling of the statute of limitations. For the reasons explained here, the court grants Respondent's motion to dismiss and denies Petitioner's motion for an evidentiary hearing as moot.

## FACTUAL BACKGROUND

On November 29, 2000, a Cook County jury convicted Petitioner of first-degree murder and attempted first-degree murder based on the testimony of the attempted murder victim and DNA evidence found on the driver's side door of the vehicle in which the victims were shot. *See People v. Hernandez*, 332 Ill. App. 3d 343, 344-47, 773 N.E.2d 170-73 (1st Dist. 2002). Judge James Schreier sentenced Petitioner to concurrent prison terms of forty-four years for murder and six years for attempted murder. *Id.* at 344, 171. On June 28, 2002, the First District Appellate Court affirmed the conviction on direct appeal. *Id.* at 352, 177. Some three months later, on October 2, 2002, the Illinois Supreme Court denied Petitioner's petition for leave to appeal ("PLA").

(Resp't's Mot. to Dismiss [18] ¶ 3.)  Petitioner did not seek a writ of certiorari in the United States Supreme Court.  (*Id.*)

On October 28, 2002, shortly after the denial of his PLA, Petitioner enlisted an organization that called itself University Research Services, LLC ("URS") to assist with his post-conviction proceedings in state court.[1]  (Pet'r's Resp. [31] at 8.)  Throughout 2002 and 2003, Petitioner corresponded with URS on numerous occasions and sent the organization documents related to possible post-conviction remedies.[2]  (*See, e.g.*, Letters from URS to Pet'r, Ex. 5 to Resp.)  On numerous occasions, URS responded to Petitioner, confirming receipt of materials Petitioner had sent.  (*Id.*)  Apparently having difficulties filing his post-conviction petition, Petitioner sent a letter to Judge Schreier on March 26, 2003, requesting an extension.  (Apr. 22, 2003 Letter from Cook Cty. Public Defender to Pet'r, Ex. 1 to Resp. to Resp't's Reply [45], at 1.)  At Judge Schreier's request, the Cook County Public Defender wrote to Petitioner and informed him that Judge Schreier would allow him "a reasonable extension of time."  (*Id.*)

As it turns out, URS was not a legitimate provider of legal services.  On April 29, 2004, the Illinois Office of the Attorney General ("IAG") filed a complaint against John Wilson, the owner of URS, alleging that Wilson had defrauded inmates by providing legal research services without a license to practice law, and by "implying that his company was approved by the Better Business

---

[1]     Throughout the pleadings and exhibits, several different names are used to refer to this organization.  In his filings, Petitioner refers to the organization as "University of Michigan Legal Services."  *(See, e.g.*, Resp. at 7, 8.)  Letters from the Illinois Office of the Attorney General ("IAG"), however, identify the organization as "University Legal Services."  (*See, e.g.*, Letters from IAG to Pet'r, Ex. 4 to Resp. to Resp't's Reply [45].)  This court will refer to the organization as "University Research Services, LLC," or "URS," because that is the name that appears on its letterhead, as submitted to the court in Petitioner's exhibits.  (*See, e.g.*, Letters from URS to Pet'r, Ex. 5 to Resp.)

[2]     Petitioner does not specify what types of documents he sent, but a December 27, 2002 letter from URS requests that Petitioner provide URS with trial and sentencing transcripts. (Dec. 27, 2002 Letter from URS to Pet'r, part of Ex. 5 to Resp., at 1.)  Subsequent letters from URS to Petitioner acknowledge URS's receipt of documents, envelopes, and photos from Petitioner. (*See, e.g.*, Letters from URS to Pet'r.)

Bureau, and affiliated with various University law libraries and well-known legal databases."
(May 6, 2004 Letter from IAG to Pet'r, part of Ex. 6 to Resp, at 1.) Upon initiation of the suit, Wilson "voluntarily agreed to discontinue business in Illinois," pending the suit's resolution. (May 6, 2004 Letter from IAG to Pet'r at 1.)

The following month, on May 21, 2004, the IAG sent Petitioner another letter in which it suggested that he "arrange for other legal counsel or contact the State Appellate Defender's Office for assistance with [his] case." (May 21, 2004 Letter from IAG to Pet'r, part of Ex. 6 to Resp., at 1.) It appears that Petitioner took that advice: on October 28, 2004, the State Appellate Defender sent him what appears to be a response to an inquiry concerning the filing of a post-conviction petition. The letter explained that the Cook County Circuit Court Clerk's records showed that no post-conviction petition had been filed on his behalf. (Oct. 28, 2004 Letter from State Appellate Defender to Pet'r, Ex. 2 to Resp. to Resp't's Reply, at 1.) Shortly after receiving that letter, Petitioner obtained new counsel to assist with his post-conviction proceedings. (Resp. to Resp't's Reply at 6) (stating that Petitioner retained new counsel "by" November 18, 2004). The IAG ultimately sent Petitioner at least six letters between April 2004 and July 2005 with updates on its investigation of Wilson. (*See* Letters from IAG to Pet'r.)

On April 3, 2006, Petitioner filed his initial post-conviction petition pursuant to 725 ILCS 5/122-1, *et seq.* (Mot. to Dismiss ¶ 4; Post-Conviction Pet., Ex. C to Resp't's Exs. in Supp. of Mot. to Dismiss [19].) At a hearing on November 14, 2007, the court dismissed the petition. (Mot. to Dismiss ¶ 4.) The state argued that the petition was untimely, but the court ultimately declined to address the question of timeliness, and dismissed the petition on the merits. (Hr'g Tr., Ex. E to Resp't's Exs., 25:20-27:15.) In its decision, the court concluded that the trial court did not violate Petitioner's right to a speedy trial when it granted the state an extension of time in order to locate a key witness. (Hr'g Tr. 26:4-19.) The court also rejected Petitioner's claim that his trial counsel was ineffective, noting that the evidence against Petitioner was convincing and that,

even if counsel had provided perfect representation, "the result probably would not be different."[3] (Hr'g Tr. 26:20-27:12.) Petitioner appealed, and on February 16, 2010, the Illinois Appellate Court affirmed the trial court's judgment. (Mot. to Dismiss ¶ 5.) Petitioner filed a PLA, which the Illinois Supreme Court denied on September 29, 2010. (Mot. to Dismiss ¶ 6.) Petitioner then filed a motion for leave to seek reconsideration, but the Illinois Supreme Court denied that motion on December 6, 2010. (Mot. to Dismiss ¶ 6.)

Finally, on September 26, 2011, Petitioner filed the instant petition for a writ of habeas corpus. (Mot. to Dismiss ¶ 7.) Respondent moved to dismiss the petition as time-barred. (Mot. to Dismiss ¶ 9.) In his response, Petitioner argued that the doctrine of equitable tolling should be applied to his claim. (Resp. [31] at 5-6.) He later filed a motion for an evidentiary hearing on the matter. (Mot. for Evid. Hr'g [40].)

### DISCUSSION[4]

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), prisoners generally have one year from the conclusion of direct review of their conviction in which to file a habeas petition. 28 U.S.C. § 2244(d). Barring other exceptions that are inapplicable here, the one-year statute of limitations begins to run on "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). In this case, Petitioner's judgment became final in state court when his opportunity to seek direct review from the United States Supreme Court expired (90 days after the Illinois Supreme Court denied his PLA) or, in other words, on December 31, 2002. Accordingly, Petitioner had until December 31, 2003, to submit his habeas petition, but did not do so until

---

[3]     The court also stated that the doctrines of waiver and res judicata apply to certain of Petitioner's arguments, but it did not specify to which claims it was referring. (Hr'g Tr. 27:3-4.)

[4]     In evaluating Respondent's motion to dismiss, the court accepts the well-pleaded allegations in the complaint as true, and draws all reasonable inferences in favor of Petitioner. *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (citation omitted).

September 26, 2011. Therefore, absent tolling, Petitioner's habeas petition is barred by 28 U.S.C. § 2244(d)(1)(A).

## I.    Statutory Tolling

Petitioner first argues that he is entitled to statutory tolling under 28 U.S.C. § 2244(d)(2), which provides that "[t]he time during which a properly filed application for State post-conviction or other collateral review . . . is pending shall not be counted toward any period of limitation under this subsection."  Petitioner contends that his post-conviction petition was properly filed, thereby triggering this statutory tolling provision.  (Resp. at 5.)  As evidence that he properly filed his post-conviction petition, Petitioner cites the fact that the state court dismissed his claim on the merits, rather than dismissing the claim as untimely.  (Resp. at 5-6.)

Regardless of whether the post-conviction petition was "properly filed," the tolling provision of § 2244(d)(2) does not save Petitioner's habeas petition.  It is well-established that "[a] state court's order denying a request for collateral review (whether on the merits or for any procedural reason) does not require the exclusion, under § 2244(d)(2), of time that passed *before* the state collateral proceeding began."  *DeJesus v. Acevedo*, 567 F.3d 941, 944 (7th Cir. 2009) (emphasis added).  In other words, though § 2244(d)(2) tolls the habeas statute of limitations while a state court post-conviction proceeding is pending, the days that pass between the conclusion of direct review and the filing of a post-conviction petition still count against the habeas statute of limitations.

Here, as Respondent observes, Petitioner commenced his post-conviction proceedings more than two years after his state conviction became final.  (Mot. to Dismiss ¶ 12.)  The one-year period to file a federal habeas corpus petition had already expired by the time Petitioner commenced the collateral attack on his conviction in state court.  The filing of a state post-conviction petition does not renew a claim that has already expired.  *See DeJesus*, 567 F.3d at 943 (explaining that what § 2244(d)(2) does is "*exclude* particular time from the year, not *restart* that year") (emphasis in original).  Therefore, the tolling provision of § 2244(d)(2) does not render

Petitioner's claim timely.

## II. Equitable Tolling

Alternatively, Petitioner argues that his claim merits equitable tolling. To be sure, the AEDPA "does not set forth 'an inflexible rule requiring dismissal whenever' its 'clock has run.'" *Holland v. Florida*, __U.S.__, 130 S. Ct. 2549, 2560 (2010) (quoting *Day v. McDonough*, 547 U.S. 198, 208 (2006)). Instead, the Supreme Court has made clear that the statute of limitations for a federal habeas petition is subject to equitable tolling, but only where a petitioner demonstrates "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland*, 130 S. Ct. at 2562 (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). "The diligence required for equitable tolling purposes is reasonable diligence, not maximum feasible diligence." *Id.* at 2565 (internal quotation marks and citations omitted).

### A. Petitioner's Fraudulent Counsel

Petitioner contends that his reasonable reliance on URS, an organization that defrauded him by holding itself out as a legitimate provider of legal services, justifies the equitable tolling of the statue of limitations for his habeas petition. Respondent points out that "neither the Supreme Court nor the Seventh Circuit has ever identified a factual circumstance that warrants equitable tolling," and argues that Petitioner's reliance on URS does not justify tolling the habeas statute of limitations. (Mot. to Dismiss ¶ 13.) In support, Respondent cites *Holland*, where the petitioner alleged that his attorney failed to conduct the research necessary to identify the proper habeas filing deadline, to communicate with the petitioner over a period of years, or, ultimately, to timely file his habeas petition, despite the petitioner's repeated attempts to contact him. *Holland*, 130 S. Ct. at 2564. As this court reads *Holland*, it provides support for the equitable tolling argument: the Supreme Court held that the alleged attorney misconduct, if true, would, in fact, constitute the "extraordinary circumstances" required for equitable tolling. *Id.* at 2564-65. In his concurrence,

Justice Alito explained further that "the AEDPA statute of limitations may be tolled if the missed deadline results from attorney misconduct that is not constructively attributable to the petitioner." *Id.* at 2568 (Alito, J., concurring). Indeed, on remand, the district court found that the allegations of egregious attorney misconduct were true and that the petitioner was entitled to equitable tolling. Order [112], *Holland v. Florida*, No. 06-cv-20182, at 6 (S.D. Fla., Nov. 22, 2010).

Here, as in *Holland*, Petitioner relied on an agent to timely file his petition, and that agent failed to follow through. The fact that the agent in this case was not an attorney at all arguably makes the circumstances of this case even more "extraordinary." Petitioner specifically enlisted URS to assist with the filing of his post-conviction petition. (*See, e.g.*, Oct. 28, 2002 Letter from URS to Pet'r, part of Ex. 5 to Resp., at 1) (stating that URS would assist Petitioner with "research of [his] post-conviction remedies"). Though the record does not state how much Petitioner paid URS, his post-conviction petition states that he provided "payment of all fees asked."[5] (Post-Conviction Pet. ¶ 7.) He also sent URS numerous letters and documents and received correspondence in return confirming receipt of his materials. (*See, e.g.*, Letters from URS to Pet'r.) Furthermore, two letters from URS to Petitioner refer to communications between URS staff and members of Petitioner's family regarding Petitioner's case. (Oct. 28, 2002 Letter from URS to Pet'r, part of Ex. 5 to Resp., at 1; Jan. 7, 2003 Letter from URS to Pet'r, part of Ex. 5 to Resp., at 1.) Petitioner's frequent correspondence with URS reasonably led him to believe that URS staff were preparing his petition, but, as Petitioner eventually discovered, they were not. Petitioner was not merely abandoned by a deficient attorney; he was purposely defrauded by a thief. The court, therefore, assumes that URS's fraudulent exploitation of Petitioner constitutes an extraordinary circumstance for purposes of this decision.

---

[5] A press release concerning the IAG's efforts to shut down URS states that "a Pontiac Correctional Center inmate . . . sent [URS] payments totaling $1,440 for so-called legal research . . . ." (Apr. 30, 2004 Press Release from IAG, part of Ex. 6 to Resp., at 1.) It is not clear from the record whether Petitioner is the inmate referenced in the press release.

Unfortunately for Petitioner, the analysis does not end there. Even if the statute of limitations is equitably tolled for the period during which URS defrauded Petitioner, argues Respondent, the habeas petition still remains untimely filed. Respondent contends that Petitioner discovered the fraud as early as April 19, 2004, when he first received a letter from the IAG stating that the office had received Petitioner's complaint against URS, as well as similar complaints from other prisoners, and that it was investigating whether URS had violated the Illinois Consumer Fraud Act. (Reply at 8; Apr. 19, 2004 Letter from IAG to Pet'r, part of Ex. 6 to Resp., at 1.) Even if the earliest letters from the IAG were insufficient to alert Petitioner of URS's fraud, Respondent urges, the latest possible date on which Petitioner became aware of the fraud is October 28, 2004, when he received a letter from the State Appellate Defender informing him that no post-conviction petition had been filed on his behalf. The letter went on to explain:

> Your only option at this time is to prepare a post-conviction petition on your own and try to get it filed, even though the time has expired. You should indicate in your request for filing that the lateness was not due to your culpable negligence. Detail your reliance on [URS]. Tell the trial court about the lawsuit filed against the company by the Attorney General and hope that the trial court allows the late filing.

(Oct. 28, 2004 Letter from State Appellate Defender to Pet'r at 1.) Petitioner received this letter by November 2004 but waited more than seventeen months before he filed his post-conviction petition. Thus, Respondent argues, the one-year period to file a habeas petition fully expired before Petitioner filed his post-conviction petition. (Reply at 8-9.)

Petitioner suggests that he did not, in fact, become aware of the fraud until July 25, 2005, when he received the last letter from the IAG explaining that negotiations with Wilson had ceased and that Wilson had filed for bankruptcy. (Pet'r's Resp. to Resp't's Reply at 5-6.) The record does not support this suggestion. First, the fact that Petitioner himself filed a complaint against URS by April 2004 demonstrates that Petitioner suspected at least some degree of wrongdoing at that time. Then, on May 21, 2004, Petitioner received a letter from the IAG which stated:

> In response to your concerns, please be advised that this office filed a lawsuit

against the operator of [URS], John Wilson, on the basis of information which indicated that Mr. Wilson was attempting to provide services that could only be provided by an attorney licensed to practice law in Illinois. Since Mr. Wilson is not an attorney in this state and does not appear to be working under the supervision of such an attorney, you should presume that the matters you entrusted to his company are still pending.

(May 21, 2004 Letter from IAG to Pet'r, part of Ex. 3 to Pet'r's Resp. to Resp't's Reply, at 1.) Petitioner states that the May 21, 2004 letter from the IAG led him to believe that URS's completion of his post-conviction petition was "still pending," and that Wilson would eventually file the petition. (Pet'r's Resp. to Resp't's Reply at 5.)  The court is unpersuaded by Petitioner's assertion: the letter specifically advised Petitioner to "arrange for other legal counsel or contact the State Appellate Defender's Office for assistance with [his] case."  (May 21, 2004 Letter from IAG to Pet'r at 1.)

Petitioner also argues that the October 28, 2004 letter from the State Appellate Defender, urging him to file his own post-conviction petition, was insufficient to put him on notice of URS's fraud, because the State Appellate Defender was not involved in the IAG's lawsuit against Wilson. (Pet'r's Resp. to Resp't's Reply at 5.)  But it was the IAG that suggested, in its May 21, 2004 letter, that Petitioner contact the State Appellate Defender for assistance.  Petitioner evidently did so, and in response, the State Appellate Defender warned him that no post-conviction petition had been filed on his behalf and recommended he prepare the petition on his own.  (Oct. 28, 2004 Letter from State Appellate Defender to Pet'r at 1.)  The letter even instructed Petitioner to explain to the state trial court that the untimely nature of his post-conviction petition was not due to any culpable negligence of his own, but to his reliance on URS, an organization under investigation by the IAG. (*Id.*)

Moreover, a March 30, 2005 letter from the IAG informed Petitioner that it had obtained a default order against Wilson and explained the significance of the order to Petitioner:  "Wilson ha[d] been deemed to have admitted" the IAG's allegations of fraud.  (Mar. 30, 2005 Letter from IAG to Pet'r, Ex. 4 to Pet'r's Resp. to Resp't's Reply, at 1.)  The IAG also asked Petitioner to submit

documents demonstrating that he had paid Wilson "for services that he could not legally perform," so that the IAG could then obtain a default judgment against Wilson requiring him to reimburse Petitioner. (*Id.*) In the court's view, this letter directly rebuts Petitioner's contention that he never learned that the allegations against Wilson were true until July 25, 2005. Petitioner notes that he "was never notified of the outcome of the default order" (Pet'r's Mot. in Supp. of Initial Mot. for Hr'g [44] at 3), and the court recognizes that even after receiving the March 20, 2005 letter, Petitioner may not have known whether or when he might be reimbursed for his payments to URS. He may not even have understood whether URS had, in fact, defrauded him in violation of the law. But Petitioner could not have reasonably believed Wilson might still file his post-conviction petition, given the numerous communications Petitioner received confirming that the IAG was suing Wilson for fraud, and that Wilson discontinued URS's business in Illinois. Finally, the most compelling piece of evidence supporting dismissal is the fact that, by November 18, 2004, Petitioner obtained new post-conviction counsel. (Pet'r's Resp. to Resp't's Reply at 6.) Petitioner would not have hired a new lawyer if he actually believed that Wilson was effectively pursuing post-conviction relief on his behalf.

In short, the record shows that Petitioner likely knew of URS's fraudulent activities by November 2004, but, at the latest, by March 20, 2005. Nevertheless, Petitioner did not file his post-conviction petition until more than a year later, on April 3, 2006. Thus, even assuming that URS's fraud qualifies as an extraordinary circumstance that "stood in [Petitioner's] way and prevented timely filing" of his post-conviction petition, those circumstances ceased to exist when Petitioner learned of URS's deception—more than one year before he actually filed for post-conviction relief. In other words, even if the court treated the fraud as an extraordinary circumstance, it still would not save Petitioner's claim: the lapse of time between the date Petitioner learned of the fraud and the date he filed his post-conviction petition shows that he had not been "pursuing his rights diligently." Put another way, even if the statute of limitations was subject to tolling during the time Petitioner was unaware of URS's wrongdoing and diligently pursuing is rights, his petition remains

untimely:  more than one year passed from Petitioner's discovery of the fraud until the filing of his state post-conviction petition, and that time would count against the habeas statute of limitations, causing it to expire.

Although there is no bright-line rule establishing the amount of time a petitioner acting with reasonable diligence needs to recover from attorney misconduct, *see, e.g.*, *Ryan v. United States*, 657 F.3d 604, 607 (7th Cir. 2011) (suggesting that taking two months to discover an attorney's mistake is reasonable, while ten months is not), the delay in this case is simply too long.  Because Petitioner has not shown that he acted with due diligence when he put off filing his post-conviction petition for more than a year after he learned of URS's deception, he is not entitled to equitable tolling.

## B.    Lack of Documents

Petitioner argues that other extraordinary circumstances stemming from the fraud prevented the timely filing his post-conviction petition.  Most notably, he states that URS never returned to him important documents that were necessary for the filing of his post-conviction appeal.[6]  (Pet'r's Am. Resp. [33] at 9.)  In support, Petitioner cites *United States v. Martin*, where the court found Martin was entitled to equitable tolling because his attorney repeatedly lied to him and his wife about the filing deadline and the status of his case, failed to file any documents on Martin's behalf, and never returned any of Martin's paperwork to him despite repeated requests that he do so.  *Martin*, 408 F.3d

---

[6]    Petitioner sets forth a number of additional circumstances which he feels entitle him to equitable tolling: (1) he had to raise money to hire his second post-conviction counsel; (2) his incarceration and lack of access to legal assistance; (3) he had to locate potential witnesses; (4) his attorney became ill for several weeks, and; (5) he was transferred to a different facility, requiring his attorney to reschedule a visit. (Pet'r's Am. Resp. at 9.)  None of those circumstances warrant equitable tolling. *See Baldayaque v. United States*, 338 F.3d 145, 152 (2d Cir. 2003) ("the usual problems inherent in being incarcerated do not justify equitable tolling"); *Modrowski v. Mote*, 322 F.3d 965, 966 (7th Cir. 2003) (an attorney's incapacity is not a basis for equitable tolling). Petitioner also notes that the IAG's proceedings against Wilson took "a good amount of time." (Pet'r's Am. Resp. at 9.)  But Petitioner did not have to wait for the conclusion of the IAG's fraud suit against Wilson in order to pursue his own post-conviction relief.

1089, 1095 (8th Cir. 2005).  Similarly, in *Valverde v. Stinson*, the court reversed dismissal of a habeas petition on the basis that equitable tolling might apply where a corrections officer allegedly confiscated the petitioner's legal papers shortly before the filing deadline.  224 F.3d 129, 132 (2d Cir. 2000).

The court is not persuaded that the circumstances support tolling for this reason.  First, Petitioner has set forth no facts explaining what documents he was missing or why the absence of those documents prevented him from timely filing his petition.  Petitioner states only that "John Wilson . . . never returned original documents needed to file postconviction and [P]etitioner had to rely on notes and [a] portion of a second copy of documents which [P]etitioner had to locate [through] family members."  (Pet'r's Resp. to Resp't's Reply at 6.)  Second, even if the missing documents constituted an extraordinary circumstance, Petitioner would not be entitled to equitable tolling because the lengthy delay before his filing demonstrates that he was not diligently pursuing his rights.  In *United States v. Martin*, for example, the prisoner discovered his counsel's fraud in May 2003, filed a motion for an extension of time in July 2003, and, when that motion was denied, filed his *pro se* habeas petition nine days later.  408 F.3d at 1091-92.  Similarly, in *Valverde*, the petitioner had his legal papers confiscated sometime in April 1997 but nevertheless filed his petition on May 6, 1997.  224 F.3d at 135.  By contrast, Petitioner here waited more than a year after the discovery of URS's fraud to file his post-conviction petition.

Finally, Petitioner contends this court should find his federal habeas filing timely because Judge Schreier granted him a "reasonable extension of time" on April 22, 2003.  (Pet'r's Resp. to Resp't's Reply at 6; Apr. 22, 2003 Letter from Cook Cty. Public Defender to Pet'r at 1.)  Whatever a "reasonable extension" may be, it is certainly less than nearly three years—the time that passed from the date of the extension until the filing of the post-conviction petition on April 3, 2006.  Though the court agrees that it would have been more helpful for the state court to articulate a specific deadline for the extension, Judge Schreier's generosity does not render this federal petition timely.

The court concludes Petitioner has not demonstrated that he was acting with reasonable diligence, and therefore, he is not entitled to equitable tolling. Respondent's motion to dismiss the habeas petition is granted.

## CONCLUSION

For the reasons explained herein, the court grants Respondent's motion to dismiss the petition for a writ of habeas corpus [18]. Petitioner's motions for an evidentiary hearing are denied as moot [40, 44]. The court will not issue a certificate of appealability, as its ruling on this procedural issue of timeliness is not one that jurists of reason would find debatable. *Gonzalez v. Thayer*, ___ U.S. ___, 132 S. Ct. 641, 648 (Jan. 10, 2012) (quoting 28 U.S.C. § 2253(c)(2)). In other words, reasonable jurists could not debate or disagree with the court's resolution of his petition, *see id.* (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). The petition is dismissed and the court declines to issue a certificate of appealability.

ENTER:

Dated: September 19, 2012

_____
REBECCA R. PALLMEYER
United States District Judge